# Baltimore & Ohio Railroad Co., Appellant, *v.* Public Service Commission.

*Railroads—Rates—Iron and steel companies—Transportation of slag—Waste—Public Service Commission.*

Iron and steel companies have no natural or statutory right to impose upon carrier railroads in their vicinity the burden of disposing, without compensation, of the waste slag which necessarily results from the manufacture of the products they market and sell, although the railroad companies transport to their plants raw material which they use, and carry away the finished products. Such companies cannot assert that reasonable compensation for such services is concealed in the published rates which they pay for bringing in their raw materials, and taking away their finished product; nor can they claim that they are exempt from such charges because the railroad companies, for a long period of time, but under different circumstances and conditions, did not enforce such payment.

An order of the Public Service Commission setting aside and abolishing a published schedule of rates for slag without establishing another schedule of rates in its place, will be reversed by the Superior Court, in the absence of any finding by the commission that the railroads were and are being paid a just and reasonable compensation for the disposition of the slag, by reason of any peculiarly favorable rate charged for the incoming and outgoing freight of the shipping companies. The appellate court will not attempt to fix a rate, but will reverse the order and remit the case to the Public Service Commission for further proper investigation and action.

If railroad companies require in the construction and maintenance of their road beds, certain quantities of slag each year, they may lawfully arrange with the companies that produce the slag for the disposition of it; but the railroad companies cannot be compelled to accept slag where they do not need it or require it, and of such need they must be the judges.

Argued May 9, 1917. Appeal, No. 136, Oct. T., 1917, by the Baltimore & Ohio Railroad Company et al., from order of Public Service Commission, in case of Baltimore & Ohio Railroad Company et al. v. Public Service Commission. Before ORLADY, P. J., PORTER, HENDERSON,

HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.

Complaint against a published schedule of rates for the transportation of slag.

From the record it appeared that until the publication of the rate in question on July 13, 1915, the railroad companies in the Pittsburgh District had not charged any rate for the transportation of slag away from the plants of iron and steel companies. The complaint was filed by the National Tube Company.

Intervention petitions were filed with the commission by

Jones and Laughlin Steel Company,
Pittsburgh Steel Company,
Clinton Iron and Steel Company,
Carnegie Steel Company,
American Steel and Wire Company,
American Sheet and Tin Plate Company,
Cambria Steel Company,
Crucible Steel Company,
Republic Iron and Steel Company,
Stewart Iron Company,
Sharon Steel and Hook Company.

The commission made the following order:

This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon complaints and answers on file and having been duly heard and submitted by the parties and full investigation of the matters and things involved having been had, and the commission having on the date hereof made and filed of record a report containing its findings of fact and conclusions thereon, which said report is hereby approved and made a part hereof:

Now, to wit, February 26, 1917, It is ordered: That the respondent companies:

Baltimore & Ohio Railroad Company,
Erie Railroad Company,

Lake Shore & Michigan Southern Railway Company,

Pennsylvania Company,

Pennsylvania Railroad Company,

Pittsburgh and Lake Erie Railroad Company,

Pittsburgh, Chartiers and Youghiogheny Railway Company,

Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company,

cease and desist from collecting or attempting to collect the charges set forth in the joint tariff of said carriers issued by C. E. E. Childers, Agent, entitled "Local Freight Tariff No. 1, P. S. C. Pa. No. 1, and Supplement No. 2," in so far as said charges are covered by the following provisions of said tariff:

"1. These carriers will accept slag, flue dust, clean ashes, or refuse moulding sand loaded into cars on private sidings of industries connected therewith, or any team track, for wasting for the plant at some convenient point on their lines, at a charge of 20 cents per ton."

And it is further ordered: That said carriers file with this commission, post and publish, a supplement to the above-mentioned tariff on or before April 2, 1917, cancelling the above quoted provision of said tariff, said supplement to become effective on one day's notice to the public and to this commission.

*Error assigned* was the order of the commission.

*W. B. Linn* and *Henry Wolf Bikle,* with them *W. W. Collin, Jr., T. H. Burgess, George Stuart Patterson, Charles H. Bergner, Clyde Brown* and *William Ainsworth Parker,* for appellants.

*Charles S. Belsterling, Charles MacVeagh, James H. Reed* and *Challen B. Ellis,* for appellee.

*Berne H. Evans,* for the Public Service Commission.

OPINION BY HEAD, J., October 8, 1917:

The report of the Public Service Commission which

resulted in the order here appealed from impressively delineates the complex elements entering into the question at issue. But the fact there are difficulties—not created by the law—in the way of a plaintiff who seeks the judgment of a court of law, furnishes no good reason for the entry of such judgment unless the foundation on which it is to rest is ascertained and made plain.

The record before us clearly shows that the steel industries, in what is called the Pittsburgh District, in the manufacture of their finished products necessarily originate a large quantity of waste that, for the purposes of this case, may be generally called "slag." The disposition of this waste is just as essential to them as the accumulation of the raw materials from the fusing of which, comes the basic commercial article that enters so largely into our modern material existence. Under the conditions prevailing in the district mentioned, the manufacturing companies were compelled to look to the carrier railroads to relieve them of the burden of disposing of this constantly accumulating waste. For many years the carriers had discharged that burden without demanding any specific compensation until in 1914 a tariff was filed, duly published and became effective. It continued in operation for many months until the National Tube Company lodged with the Public Service Commission a complaint alleging the said tariff to be unreasonable, arbitrary and unjust. Numerous manufacturers, affected like the original complainant, asked and obtained leave to intervene and thus, in effect at least, became additional complainants. The various carrier railroads made responsive answers and thus the proceeding we are to review was initiated.

The published tariff complained of was as follows: "These carriers will accept slag, flue dust, clean ashes or refuse moulding sand loaded into cars on private sidings of industries connected therewith or on any team track for wasting for the plant at some convenient point on their lines at a charge of twenty cents per ton." After

lengthy hearing and much testimony taken the Public Service Commission made the following order, to wit, that the various "carriers cease and desist from collecting or attempting to collect the charges set forth in the joint tariff of said carriers—just quoted—and that the said carriers file with this commission, post and publish a supplement to the above mentioned tariff on or before April 2, 1917, cancelling the above quoted provision of said tariff, said supplement to become effective on one day's notice to the public and to this commission."

It is thus apparent that the Public Service Commission has not only abolished the effective rate theretofore in existence but has substituted no other in its stead and has in effect declared the carrier railroads of the Pittsburgh District are not within their right in making even a reasonable charge for transporting from the furnaces and steel mills the accumulating waste which the mills themselves are wholly unable to dispose of. It appears to us that in determining whether or not such a decree is reasonable and in conformity with law, we should address our attention to these questions:

(1) Have the complainants shown any natural or legally acquired right to impose upon the carrier railroads in their vicinity the burden of disposing of the slag which necessarily results from the manufacture of the products they market and sell?

(2) If no such right can be shown to have been directly created by statute or contract, may the complainant companies assert that reasonable compensation for such services is concealed in the published rates which they pay for bringing in their raw materials and taking away their finished products?

(3) Has the Public Service Commission found, as a fact, that reasonable compensation has been and is being paid to the carrier companies for the disposition of the slag in other rates which by law affect all consumers of such material in the district, as well those who produce no waste as the complainants?

(4) Finally, if there exists in the report of the commission such a finding, is the remedy to deny to the carriers the right to charge any rate for the disposition of the slag or to reform the alleged rates which are said to conceal compensation for the disposition of the slag?

1. In this case no question of natural right does or can arise. If then our judgment is to be rested on the proposition the complainant companies have legally acquired such a right, we should be able to point to the statute or contract creating it. No one asserts the existence of such a statute or that such contract was at any time made and executed by the parties interested or any of them. Nothing of value in aiding us to reach a sound conclusion can be predicated of the fact that for many years no specific charge was made for the service under conditions widely differing from those now prevailing, not only as to the needs of carrier and shipper but as to the legal conception of their mutual rights and obligations. We must therefore answer the first question in the negative.

2. The trend of modern legislation and judicial decisions, both federal and state, is plain. A carrier railroad company is no longer at liberty to deal with its patrons one by one and accord to a favored one what may be denied to one less fortunate. The carrier is now required by law not merely to make the same charge for the same service against every shipper but to exact the payment of such charges from all alike; and for the same reason it is forbidden to return to a favored shipper, by way of rebate or otherwise, any portion of the rate thus demanded and received. If it were not so, all effort on the part of our lawmakers to prevent and crush out unjust discrimination in favor of one shipper and against another would be fruitless and vain. It may be true the complainant companies are extensive patrons of the carrier companies in their district and furnish vast tonnage which results in a large percentage of the operating revenues of the carrier companies, but

it is just as plain that the business of the manufacturing companies could not be carried on at all without the transportation facilities afforded by the railroad companies. Arguments ad personam or ab in convenienti are usually not convincing. If it can be urged on the one hand that a study of the revenues of the carrier companies and the sources thereof leads to the conclusion they have not suffered in the past, it is quite as clearly apparent the complainant companies have not needed any outside gratuities to maintain them in a state of financial solvency.

3 and 4. The report of the Public Service Commission does not find, as a fact, that the complainant companies pay a higher tariff rate for the raw material they receive, largely composed of fuel (coal and coke), sand, limestone, etc., than do other industries in the same district which create no slag or waste of consequence, and which therefore should not be compelled to pay for more than the service they receive. In such a state of the record it is difficult for us to understand how it can be successfully asserted the complainant companies pay, in another form, the reasonable rate which they ought to pay for the service of the carrier companies in transporting their slag and waste. We are not content that the judgment of this court should rest on any such foundation. The Public Service Commission has not found as a fact, supported by evidence, that the carrier railroads have been and are being paid a just and reasonable compensation for the disposition of the slag, by reason of any peculiarly favorable rate charged for the incoming and outgoing freight of complainant companies. The situation thus resolves itself into one of two alternatives. Either the carrier companies, under the decree complained of, will receive nothing for the transportation of many thousands of tons of material, or they are now exacting an unreasonable and therefore unlawful rate for transporting to the complainants' mills the raw material required and delivering to the market their finished prod-

ucts. If we adopt the first alternative, we reach a conclusion that appears to us to be wholly untenable, whether we regard it from the standpoint of law or reason. If we accept the other alternative, the manifest remedy is to reform the rate wherein the alleged unfairness and injustice may be concealed, but not to create a new condition fully as unreasonable and unfair as could in any way be predicated of the old one. It may be true that in the transportation of all of the slag and waste heretofore, carried from the mills, the carrier companies were not engaged in a public service. A railroad company must buy steel rails at the steel mills, must buy its spikes at perhaps other kinds of mills, must buy its ties in the wooded districts of this State or other states, and must transport all of them to the portions of its line where the necessity for them may exist. In doing this they are not directly engaged in the public service but only indirectly so in the sense that the demands of the public service require them to maintain their transportation facilities in good order and repair. So if it be true that the carrier companies require, in the construction or maintenance of their roadbeds, certain quantities of slag each year, they may lawfully arrange with the companies that produce the slag for the disposition of it. Such service would not properly be covered by a filed and published tariff. But the carrier companies cannot be compelled to accept slag and dispose of it where they do not need it or require it and of such need they of course must be the judges. This situation is we think well stated in the report of the Interstate Commerce Commission written by Mr. Commissioner Daniels, In re Charges for Transportation and Disposal of Waste Materials at Pittsburgh and other Cities, reported in 34 I. C. C. page 337: "As to the contention that the slag is of value to the carriers and worth to them more than it costs, the carriers' denials and their proposed tariff charges for the disposal service must be final. We see no reason why this disposal service must be performed gratuitously by

the carriers.    We see no reason why, by the filing of appropriate tariffs, and conforming with other requirements attending the business of common carriage, regular tariff charges for this service may not be filed, demanded and collected."

We need not concern ourselves with the alleged technical defects in the published tariff referred to in the complaint for the reason the commission itself has determined them to be without any solid foundation.    We are of opinion therefore that the respondent companies have not only the right to fix a reasonable rate for the transportation of slag, not taken over for their own use, but that it is their duty, under the law, to do so.    The modern attitude towards public service companies is that the law requires them to be just before it permits them to be generous; just to their individual shippers, just to their stockholders and just to the great public whose prosperity depends on a wise and fair management of these great arteries of our material and commercial life. On the record, as certified to us by the Public Service Commission, we are not able to say that the order appealed from is either reasonable or in conformity with law.    But this court is not a rate making body.    We have already so declared and we have no intention of departing from the view of our functions and powers we have already announced.    If it be the conclusion of the Public Service Commission it is their duty, on the complaint before them, to fix a just and reasonable rate to be charged by the carrier companies for the transportation of the waste of the complainant companies, and all others in like situation, we are not to be understood as declaring they may not do so.    The question is not before us.    But in fixing what is a reasonable rate heed must be paid to the declarations of our Supreme Court on the subject, cited and quoted in our own recent case of B. & O. R. R. Co. v. The Public Service Commission, 66 Pa. Superior Ct. 403.    Such a rate cannot be fairly and legally disposed of by a consideration only of what

is called in the latest utterance of the Supreme Court of the United States an "out of pocket" cost. We refer to the case of Miss. R. R. Commission v. Mobile & Ohio R. R. Co., reported in the "Advance Opinions" of that court under date of July 15, 1917.

The order appealed from is therefore reversed and set aside, the record is remitted to the Public Service Commission for such further investigation, if any, as in the judgment of the commission may be necessary in order to dispose of the issue before them in accordance with the legal principles we have herein stated. The costs of this appeal to be paid by complainants.